IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| SHAWNEE MATHIS, *et al.* ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:09-0034 |
| ) | Judge Trauger |
| WAYNE COUNTY BOARD OF ) | |
| EDUCATION, *et al.* ) | |
| ) | |
|     Defendants. ) | |
| ) | |

## MEMORANDUM

Pending before the court is the defendants' Motion for Summary Judgment (Docket No. 55), to which the plaintiffs have responded (Docket No. 73), and the defendants have filed a reply in support (Docket No. 83). The defendants have also filed a Motion to Strike (Docket No. 79), to which the plaintiffs have responded (Docket No. 89). For the reasons discussed herein, the Motion for Summary Judgment will be granted in part and denied in part, and the Motion to Strike will be denied as moot.

## FACTUAL AND PROCEDURAL BACKGROUND

The plaintiffs are mothers suing on behalf of their sons, who were in the 7th grade at Waynesboro Middle School (WMS) in Waynesboro, Tennessee, during the 2008-2009 school year.[1] The events of this case surround the boys' basketball team at WMS, which is a school

---

[1]Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 74 and 82) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn

1

sponsored and sanctioned activity that conducts practices on school grounds.

John and James Doe were both on the basketball team at the start of the 2008-2009 season, along with D.B., J.B., C.S., and C.K., who were in the eighth grade at WMS. Individuals tried out and had been named to the team by Coach/defendant David Sisk during the preceding spring semester.

Beginning in the fall semester, practice took place in the afternoon, during the sixth and final period of the day. Sisk taught a fifth period language arts class, which ended at 1:30 p.m., and he would go to the gym immediately following that class to conduct basketball practice, usually making it to the gym in time for the start of sixth period, which began at 1:45 p.m. During the 15 minutes between fifth and sixth period, team members were expected to change into appropriate attire in the locker room and be ready to begin practice at the start of sixth period.

When Sisk arrived in the gym area, he would generally briefly stop by the locker room to obtain any equipment and make sure that the students were basically ready to begin practice. According to John Doe and teammate Z.R., Sisk was a relatively infrequent presence in the locker room *after* practice, only coming in there "every once in a while" and for very brief periods such that "he was never really in there." (Docket No. 58 at 18-19; Docket No. 85 at 30.)

---

in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The vast majority of the relevant briefing and filings are under seal due to the nature of the factual allegations and the age of the individuals involved. The sealed documents reveal the full names of all of the relevant parties. Consistent with the Amended Complaint, the court will refer to the plaintiffs' children as John and James Doe, although the boys are not related. The juvenile witnesses and alleged perpetrators will be referred to by their initials.

Sisk concedes that he was not entirely comfortable staying in the locker room while his players were changing (students generally did not shower in the locker room, however), but that he checked in more frequently than John Doe and Z.R. indicated. (Docket No. 63 at 55-57.)

Z.R. also testified that, when Sisk was not in the locker room, it was "chaos" and a "wild, insane, crazy" environment in which certain eighth-grade players frequently pulled "pranks" on seventh-grade players. (Docket No. 85 at 32, 46, 66.) Not uncommonly, when a group of players was gathered in the locker room, an eighth grader would shout "lights out!," at which time an eighth grader would turn off the lights in the locker room and various eighth graders would gather around various seventh graders (including the plaintiffs) and begin "humping" and gyrating on them, and this would usually last for a minute or two. Seventh grader K.N. testified that such "humping" activities also took place with the lights on and that some sort of "humping" activity took place several times per week. (Docket No. 84 at 14-16.) K.N. testified that he was afraid of the eighth-grade boys and that is why he did not tell Coach Sisk or any other authority figure about the "lights out" activities. (*Id.* at 19.)

Z.R. testified that, early in the fall semester, during a study hall, Coach Sisk was engaged in a discussion with some of the players about pranks that he had seen on television. (Docket No. 84 at 16, 22, 24.) Coach Sisk described a prank known as the "blindfolded sit-up," in which an individual dares another to do a sit-up blindfolded, asserting that it is impossible to do one. (*Id.*) If the person takes the dare and blinds himself, when the person comes to the end of the sit-up, the challenger (or an acquaintance of the challenger) will have placed his (usually naked) rear end so that the person performing the sit-up hits the rear end with his face. Coach Sisk

3

concedes that he told his players of this prank but, consistent with Z.R.'s testimony, stated that he then told them never to do it. (Docket No. 63 at 76-77.) During his deposition, James Doe recalled that, on one occasion, Sisk walked in on an attempted blindfolded sit-up and told the students involved to stop. (Docket No. 59 at 19.)

Aside from "lights out," the plaintiffs focus on three additional instances of misconduct in the locker room, all of which occurred in mid-October 2008. First, John Doe testified that he observed an eighth grader attempt to put a pencil up the rectum of a seventh grader. (Docket No. 58 at 21-22.) There is some indication from the record that Sisk knew of this incident. That is, one seventh grader, K.K., told police that Sisk knew of the "pencil incident" and made the eighth grader, D.K., run as punishment for it. (Docket No. 63 at 60.) In his deposition, Sisk did not deny that he made D.K. run for this misconduct but stated that he could not remember. (*Id.* at 68.) Earlier in his deposition, Sisk testified that it was his recollection that he first learned of the "pencil incident" when investigating the "marker incident," discussed below. (*Id.* at 58-59.)

Around the same time, some of the eighth graders challenged James Doe to the "blindfolded sit-up" that Coach Sisk had described to the players. James Doe accepted the challenge, and, as both John Doe and K.N. testified, James Doe's face made contact with the naked rear end of one of the older players. (Docket No. 58 at 23, 26; Docket No. 84 at 22; Docket No. 59 at 12.) James Doe testified that he initially viewed the blindfolded sit-up as a practical joke, but he also stated that he did not complain of the various incidents that occurred in the locker room because he "was intimidated, you could say scared." (Docket No. 59 at 7, 13.)

A few days later, after basketball practice, three eighth graders, C.S., J.B., and C.K.,

4

grabbed John Doe and held him down while D.K. grabbed a magic marker, pulled down Doe's shorts, and placed the marker up John Doe's rectum. Specifically, John Doe testified, "they held me down and shoved a marker up my butt." (Docket No. 58 at 19.)

News of the incident involving John Doe quickly started making its way around the student body at WMS. Other students taunted John Doe in the halls, calling him "gay" and a "faggot," to which John Doe responded with similar slurs. (Docket No. 58 at 31.) A couple of days after the "marker incident" (on October 23 or 24, 2008), John Doe's mother, plaintiff Mathis, saw a text message from John Doe's girlfriend that stated, "I heard what those boys did to you and that is awful." (Docket No. 60 at 18-19.) When Mathis asked John Doe about the text message, John Doe told his mother that some boys had briefly trapped him in a storage closet. Mathis did not believe that her son was telling the whole story.

On Sunday, October 26, 2008, Coach Sisk's stepdaughter, an eighth grader at WMS, told Sisk that she had heard that D.K. had tried to "stick something up [John Doe's] butt," but she had no other details. (Docket No. 63 at 61.) When Coach Sisk ran into Ms. Mathis the next evening at a Sonic restaurant, he did not mention the rumor, although the two discussed some general concerns that John Doe was being picked on. Sisk stated that, if he learned of anything specific, he would "stop that s–t quick." (Docket No. 74 at 8-9.) Sisk maintains that, over the next couple of days, he asked John Doe about the alleged "marker incident," and that John Doe denied anything inappropriate had occurred.

John Doe testified that he got along well with Sisk and that he would not have been scared to tell Sisk of the mistreatment. (Docket No. 58 at 20-22.) He also testified that he

5

"didn't know" why he was not more forthcoming with Sisk about the locker room misconduct, but he generally felt that these were "pranks" that older students did to younger students. (*Id.*) He also generally denied that he was threatened by the older students not to tell Sisk or others about what transpired in the locker room. (*Id.*)

On Wednesday, October 29, 2008, when Mathis and John Doe were heading to an evening church service, Mathis received a phone call from her husband, who told her that their former minister had told him that he had heard that "a magic marker had been shoved in [John Doe's] rectum." (*Id.* at 11.) Upon additional further questioning from Mathis, John Doe eventually conceded that he had been violated with the marker. According to his testimony, this was the first time that John Doe thought that what transpired in the locker room was a "big deal." (Docket No. 58 at 22.)

The next morning, Mathis went to WMS and brought the incident to the attention of Principal/defendant Ryan Keaton. Keaton, upon learning of the incident, "called off" practice for the next two days and informed Mathis that any disciplinary proceedings would have to wait until the next day, when Director of Schools/defendant Wanda Johnston got back into town from training. Keaton also contacted Wayne County Schools "Complaint Manager" Gailand Grinder, and, on his recommendation, Keaton initiated a preliminary investigation. Throughout the day, Keaton discretely interviewed the individuals that Mathis had alleged were involved in the "marker incident," along with Coach Sisk.

In those discussions, Sisk conceded that he had heard a rumor along the lines of Mathis's allegation, but that "everything was denied by all those apparently involved." (Docket No. 74 at

6

15.) After two days of investigation and obtaining written statements from all those involved, Keaton, Grinder and Johnston all concluded that an incident similar to that alleged by Mathis had occurred, the perpetrators should be suspended, and that an outside agency needed to be brought in, "due to the seriousness of the allegations." (*Id.*)

The defendants maintain that they contacted the Waynesboro City Police Department and that "Keaton ceased any further investigation at the instruction of the police chief." (*Id.* at 16.) The plaintiffs, citing to deposition testimony that does not appear to be in the record, maintain that the police department did not order a halt to the WMS investigation and, in fact, explicitly told the defendants that the police department would not share the results of its investigation with school officials.

Either way, based upon Keaton's initial findings, the four eighth graders involved in the "marker incident" were placed in the "Alternative School" for 10 days, pending a disciplinary hearing authority (DHA) meeting. Under the relevant rules and regulations, this was the maximum suspension that Keaton could have imposed prior to a DHA meeting. The suspension began on Monday, November 3, 2008, and was categorized as a suspension for "hazing."

Shortly thereafter, Paula Morris, who is a counselor at WMS, overheard students discussing the blindfolded sit-up involving James Doe. On questioning by Morris, James Doe confirmed that he had been subjected to the blindfolded sit-up. Morris thereafter called DCS to report the incident and encouraged James Doe to discuss it with his mother. After James Doe told his mother, plaintiff Tammy McGuire, of the sit-up, McGuire called Keaton to discuss it. Additionally, on November 6, 2008, Johnston met with McGuire, Justin Mathis (the husband of

7

the plaintiff), and K.N.'s father, and, during this meeting, concerns surrounding the "marker incident," "lights out," the blindfolded sit-up, and Sisk's alleged lack of supervision of the players were discussed. On November 7, 2008, Johnston issued Coach Sisk a written reprimand for failing to report the "marker incident" to school officials.

However, no further investigation of these varied allegations was conducted, and no further discipline against any students was levied. Rather, Keaton and others believed that the appropriate course was to prevent a recurrence of these events through increased locker room supervision and through a meeting with the team once the suspensions ended.

On November 17, 2008, the DHA met, with Johnston and Keaton present. The additional allegations raised at the November 6, 2008 meeting were not discussed, and the DHA (with Keaton among the voting members) voted to add one day to the four boys' suspension (totaling 11 days) and to allow them to rejoin the basketball team effective January 1, 2009.

The four boys appealed their suspensions, and, at a December 18, 2008 proceeding, the Wayne County Board of Education voted unanimously to reinstate the four boys to the basketball team, retroactively to December 1, 2008. In light of the incidents, the level of punishment that the four boys received, and their continuing concerns about their sons' well-being, both Mathis and McGuire withdrew their children from WMS, with McGuire withdrawing James Doe on November 10, 2008 and Mathis withdrawing John Doe on December 18, 2008.[2] James Doe was homeschooled for the remainder of the fall semester before being

---

[2]The parties dispute the extent to which WMS, both before and after the incidents discussed above, addressed bullying in schools, with the plaintiffs arguing that, generally, bullying was rampant at WMS and that the classroom instruction, training, policies and

8

enrolled in another school, and John Doe briefly attended a school in Alabama, before being enrolled in another school in Tennessee.  John Doe testified that his last several weeks at WMS were unpleasant, as other members of the team blamed him for the team's struggles following the "marker incident" and the related suspensions.  (Docket No. 58 at 35.)

Sisk claims that his team appeared to get along exceptionally well and that he was "shocked" to learn of these incidents of sexual misconduct.  (Docket No. 74 at 5.)  Sisk, consistent with the facts discussed above, acknowledges that "horseplay" did go on between the players, and, in the past, when he observed conduct that was not appropriate (such as punching or talking back) he would make the offender run as punishment or might suspend the player if the conduct was particularly inappropriate.  From his deposition, it is clear that Sisk also has a broad definition of "horseplay."  He testified that the "marker incident" was "horseplay that got out of hand," that the blind-folded sit-up was an ill-conceived "practical joke," and that "lights out" constitutes "horseplay."  (Docket No. 63 at 84-89, 92-93.)

On July 14, 2009, Ms. McGuire and Ms. Mathis, on behalf of their children, filed this lawsuit against Keaton, Sisk, Johnston, and Wayne County.  (Docket No. 1.)  Presently, the plaintiffs assert a claim under Title IX of the Educational Improvement Act Amendments of 1972, 20 U.S.C. § 1681(a), against the Wayne County Board of Education and a Section 1983

---

procedures that WMS had in place to address bullying were insufficient and not consistent with recognized "best practices."  (Docket No. 74 at 12, 17-19; Docket No. 82 at 14-17.)  The defendants respond that these materials were sufficient and, heretofore, bulling or abusive behaviors had not been a problem at WMS.  (*Id.*)   As can be seen herein, exploring the general issue of how widespread bullying was at WMS is not necessary to resolve the claims at issue here.

9

claim against all defendants. (Docket No. 46.)

## ANALYSIS

I.      **Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

II.     **The Motion for Summary Judgment**

10

## A. Title IX

It is well settled that a student may pursue an action for student-on-student sexual harassment against a state educational entity (such as the Wayne County Board of Education) that receives federal funding. *See Davis v. Monroe County Bd. of Education*, 526 U.S. 629, 633 (1999). To prevail on such a claim, the plaintiff must show that (1) the sexual harassment was "severe, pervasive, and objectively offensive," such that it "deprive[d] the plaintiff of access to the educational opportunities or benefits provided by the school"; (2) the funding recipient had "actual knowledge of the sexual harassment"; and (3) the funding recipient was "deliberately indifferent to the harassment." *Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 258-59 (6th Cir. 2000)(citing *Davis*, 526 U.S. at 651). The Sixth Circuit has concluded that one – sufficiently severe – incident of sexual harassment could "satisfy a claim" under Title IX. *Id.*

Judge Echols discussed the actual knowledge requirement in *Staehling v. Metro Government of Nashville and Davidson County*, 2008 WL 4279839, *10 (M.D. Tenn. Sept. 12, 2008), stating that, "[p]ost-*Davis*, some courts have held that, given the limitations on liability under Title IX, a school must be aware that a particular individual was subjected to a sexually hostile environment or that a particular individual was the perpetrator of sexual harassment. The more accepted view, and the one this Court adopts, is that, to be liable, the institution must have possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." (internal citation and quotation omitted). *See also Doe v. Farmer*, 2009 WL 3768906, *9 (M.D. Tenn. Nov. 9, 2009 )(Trauger, J.)(consistent with this, under Sixth Circuit law, school must

11

know of "substantial risk" of harassing conduct).

As to deliberate indifference, the Sixth Circuit has held that, to avoid liability, the funding recipient "must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Vance*, 231 F.3d at 260 (quoting *Davis*, 526 U.S. at 648-49). The court is not to "second guess" disciplinary decisions made by school officials or require expulsion in every case of misconduct; rather, if the response of the school officials can be considered reasonable, a finding of deliberate indifference is not appropriate. *Id.*

The defendants argue that the plaintiffs' Title IX claim fails because the harassment was not sufficiently severe, as demonstrated by the fact that John and James Doe did not think the incidents were significant until their mothers informed them that they were. (Docket No. 69 at 6-8.) The defendants also argue that John and James Doe were not denied "educational opportunities" because of the harassment but, instead, left school due to "their parents' decision to remove them after they were unhappy with the level of discipline." (*Id.*) The defendants further claim that the record demonstrates that school officials did not have "actual knowledge" of the harassment, and Keaton's prompt suspension of the students and his proactive measures to prevent recurrence of the misconduct indicate that the school was not "deliberately indifferent." (*Id.*)

In response, the plaintiffs argue that, as unpleasant as the sit-up and the "marker incident" were, the harassment alleged is broader than those two incidents. That is, viewing the facts in the light most favorable to the plaintiffs, John and James Doe were subjected to regular, unpleasant "humping" incidents, exposed to sexual violations committed or attempted on other

12

students, and, finally, each suffered a significant, particularly troubling incident – for John Doe, the "marker incident," and, for James Doe, the sit-up. (*See* Docket No. 73 at 9-12.) These events, and the school's response to them, forced the students to eventually leave school and the basketball team, "depriving [them] of access to educational opportunities or benefits." (*Id.* at 10.)

The plaintiffs point to two other cases in which the court denied summary judgment to the funding recipient on the issue of whether the alleged sexual misconduct was sufficiently severe, offensive, and pervasive. (*Id.*) In *Roe v. Gustine Unified School District*, 678 F. Supp.2d 1008 (E.D. Cal. 2009), the plaintiff alleged that, during a three-day high school football camp, older students had (1) placed an activated, battery controlled air pump up his rectum, (2) grabbed his buttocks in the shower, (3) exposed themselves, and (4) hit him with pillows containing hard objects. *Id.* at 1013-14. The court, in finding the first prong of the Section 1681(a) test satisfied, found that a reasonable jury could conclude that the severe harassment deprived the plaintiff of the opportunity to take advantage of educational resources at the football camp. *Id.* at 1028-29. Likewise, in *Doe v. Coventry Board of Education*, 630 F. Supp.2d 226, 233 (D. Conn. 2009) the court found sufficient evidence of deprivation of educational opportunities where the plaintiff was forced to continue to attend school with a boy who had sexually assaulted her, exposing her "to the possibility of an encounter with him."

On "actual knowledge," the plaintiffs argue that, while Sisk may not have learned of the most severe misconduct until after the fact, he possessed "enough knowledge of the harassment" to respond to it and to address the "kind of harassment" on which the plaintiffs' claims are based.

13

(*See* Docket No. 73 at 13.) That is, Sisk knew of "horseplay," a term for which he has a broad definition. (*Id.*) Additionally, as discussed above, there is evidence in the record suggesting that Sisk knew of at least one attempted blindfolded sit-up and of the "pencil incident." (*Id.* at 14.)

As to "deliberate indifference," the plaintiffs argue that Sisk knew enough about the "horseplay" problem in the locker room that his response to it, which included (1) not closely supervising the players before or after practice, (2) making students simply run as punishment for misconduct, (3) fanning the flames by telling players stories of pranks, and (4) not reporting the "marker incident" when he learned of it, could be reasonably found to constitute deliberate indifference to the risk of sexual harassment. (*Id.* at 15.)

The plaintiffs have presented sufficient evidence to move forward with their Section 1681(a) claim against the Wayne County Board of Education. The court finds that, viewing the facts in the light most favorable to the plaintiffs, the harassment was "severe, pervasive, and objectively offensive," such that it "deprive[d] the plaintiff[s] of access to the educational opportunities or benefits provided by the school." The plaintiffs have presented credible evidence that they were subjected to months of ongoing harassment of a sexual nature (the "lights out" exercise), and each was subjected to a particularly offensive single incident. There is a direct causal linkage between the harassment (and the school's response thereto) and the decision by the plaintiffs to pull their sons out of WMS, depriving them of considerable educational opportunities, including a continuous school year in the same environment and the opportunity to continue on the basketball team. The first prong of the test is easily met.

The "actual knowledge" question is certainly closer. That said, there is testimony in the

14

record such that a reasonable jury could conclude that Sisk knew of at least one attempted blindfolded sit-up and of the "pencil" incident, along with broadly defined "horseplay." A reasonable jury could, therefore, conclude that, based on all of the testimony and circumstances, someone in Sisk's position would know "enough" about sexual harassment of younger players on the team to step in and attempt to effectively address the problem.

The same jury could also find that Sisk was deliberately indifferent for all of the reasons expressed by the plaintiffs. That is, the jury could conclude that for Sisk to offer no substantive response to the bubbling problem of sexual harassment on the team was unreasonable. This finding would be aided by the fact that Sisk arguably, if inadvertently, encouraged this misconduct by giving his players the idea of the blindfolded sit-up and by the fact that Sisk appears to have consistently "looked the other way" rather than facing the problem, that is, not entering the locker room after practice to supervise his players, even after seeing one attempted blindfolded sit-up, hearing of the "pencil incident," and knowing that other assorted "horseplay" was ongoing.

For all the reasons stated herein, the defendants' motion for summary judgment on the Title IX claim will be denied.

**B.     Section 1983**[3]

---

[3]The plaintiffs' Amended Complaint references the "equal protection clause" on numerous occasions (Docket No. 46), but the plaintiffs make no effort to defend that aspect of their claim in response to the defendants' summary judgment briefing. As the plaintiffs have not attempted to make the required showing that they were treated differently from similarly situated female students, this aspect of the plaintiffs' Section 1983 claim will be dismissed. *See Soper v. Hoben*, 195 F.3d 845, 852 (6th Cir. 1999).

15

To state a claim under Section 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the violation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). The plaintiffs' Section 1983 claim, which is brought against all defendants (Docket No. 46 at 14-15), is based upon the argument that their recognized liberty interest in bodily integrity was violated without due process. (*See* Docket No. 69 at 9; Docket No. 73 at 17; *see Soper* 195 F.3d at 852). There is no dispute, however, that the violations of bodily integrity at issue here were committed by students, not state actors, meaning that, under the general rule, the defendants could not have Section 1983 liability. *See Cartwright v. City of Marine City*, 336 F.3d 487, 491 (6th Cir. 2003).

The plaintiffs invoke the state-created danger exception. (Docket No. 73 at 17.) Under this exception, the plaintiff may proceed against a state actor for injuries sustained at the hands of non-state actors, if (1) the state actor, through "an affirmative act . . . either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party"; (2) the affirmative act placed the plaintiff "specifically at risk" and in "special danger" compared to the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff. *Cartwright*, 336 F.3d at 493. Again, under this theory, a "failure to act" is not an affirmative act; the plaintiffs must show that Sisk or some other defendant affirmatively took an action that increased the plaintiffs' "vulnerability" or otherwise put them in harm's way. *Id.*

The plaintiffs maintain that the state-created danger exception applies here because "Sisk

16

created the hostile atmosphere" in the locker room by tolerating horseplay, not sufficiently punishing D.K. for the "pencil incident," and by telling the story of the blindfolded sit-up. (Docket No. 73 at 17-18.) That is, unlike incidences where Section 1983 liability is not appropriate because the harassment or violence would have occurred regardless of teacher conduct, "the incidents that occurred in this case . . . took place only through the encouragement of Sisk." (*Id.* citing, counterfactually, *McQueen v. Beecher Community Schs.*, 433 F.3d 460 (6th Cir. 2006)).

The defendants maintain that the plaintiffs have failed to sufficiently demonstrate an "affirmative act" that "created or increased the risk . . . of violence" against the plaintiffs, and the court agrees. For the most part, the plaintiffs challenge Sisk's failure to supervise and failure to discipline, which do not qualify as affirmative acts. The only affirmative misconduct that the plaintiffs can point to is the story about seeing the prank on television.

The connection between this single story, told by Sisk to a group of his players, and the ongoing harassment and violence suffered by the plaintiffs is simply too tenuous to conclude that Sisk's story was an "affirmative act" that increased the risk that "the plaintiff would be exposed to an act of violence by a third party." Rather, both before and after the story, the eighth graders had found various ways (including humping and penetration with foreign objects) to sexually harass/assault the seventh-graders, including the plaintiffs.

Sisk's story was undoubtedly ill-advised, and it certainly strengthens the plaintiffs' deliberate indifference argument under Section 1681(a), but the plaintiffs have not sufficiently shown that Sisk's conduct actually increased the risk of harassment, as opposed to, inadvertently,

17

simply giving the eighth-graders another arrow in their quiver. Unfortunately, the plaintiffs were at a significant risk of sexual violence both before and after the story and, therefore, the court concludes that the state-created danger exception does not apply. *McQueen*, 460 F.3d at 467 (where the risk of harm is as likely had the state actor done nothing, there is no relevant "affirmative act.")

The plaintiffs' supervisory liability and failure-to-train claims under Section 1983 similarly fail. In order to impose supervisory liability, there must be an underlying Section 1983 violation and, at least, "implicit authorization" from a supervisor for that act. *McQueen*, 460 F.3d at 470. Not only is there no underlying Section 1983 violation, but the plaintiffs, in arguing for this claim, simply recount the steps taken by Keaton and Johnston in their investigation of locker room misconduct, making no effort to show that they, at least implicitly, authorized any Section 1983 violations as they took place. (Docket No. 73 at 19-20.) Likewise, a failure-to-train claim depends on an underlying Section 1983 violation, and no such violation has been shown here. *McQueen*, 460 F.3d at 471. Therefore, the defendants are entitled to summary judgment on the Section 1983 claims.[4]

---

[4] On February 14, 2011, the defendants filed a motion to strike the affidavits of plaintiffs' purported experts, Carole de Casal and Roger Dinwiddle. (Docket No. 79.) The defendants argued that de Casal submitted an affidavit in response to the summary judgment motion that improperly and repeatedly characterized the defendants' conduct as rising to the level of deliberate indifference. (Docket No. 80 at 1.) The defendants argue that it was inappropriate for de Casal to assert this legal opinion and that her deposition testimony on the issue suggested that she had little idea how to correctly define the term. (*Id.* at 1-4, citing *Berry v. City of Detroit*, 25 F.3d 1342, 1352 (6th Cir. 1994)). Moreover, the defendants challenged Dinwiddie's affidavit as unhelpful, as he largely stated what the "best practices" for a school in this situation would be. (*Id.* at 4-5.) The court will deny the motion as moot, because, as can be seen herein, the affidavits submitted by the plaintiffs' purported experts, while analyzed by the court, ultimately

## **CONCLUSION**

The defendants' Motion for Summary Judgment will be granted as to the Section 1983 claim, and denied as to the Title IX claim. Therefore, all defendants aside from the Wayne County Board of Education will be dismissed.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

had no bearing on the court's analysis or conclusions. The defendants may seek to exclude this testimony at trial through a properly supported *Daubert* motion.

19