IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| SHAWNEE MATHIS, *et al.* ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:09-0034 |
| ) | Judge Trauger |
| WAYNE COUNTY BOARD OF ) | |
| EDUCATION, ) | |
| ) | |
|     Defendant. ) | |
| ) | |

## MEMORANDUM

Pending before the court is the defendant Wayne County Board of Education's (WBOE's) Motion for Judgment After Trial or in the Alternative for a New Trial (Docket No. 144), to which the plaintiffs have responded (Docket No. 150). Also, the plaintiffs have filed: (1) a Motion to Set Attorney's Fees (Docket No. 148), to which the WBOE has responded (Docket No. 151), and (2) a Motion for Post-Judgment Interest (Docket No. 147). For the reasons discussed herein, the WBOE's motion for post-trial relief will be denied, and the plaintiffs' motions for fees and interest will be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 14, 2009, the plaintiffs, Shawnee Mathis and Tammy McGuire, filed this suit on behalf of their sons – referred to here respectively as John and James Doe – who were in the 7th grade and on the boys' basketball team at Waynesboro Middle School (WMS) in Waynesboro, Tennessee, during the 2008-2009 school year. (Docket No. 1.) The plaintiffs alleged that their

1

sons were subjected to student-on-student sexual harassment at the hands of certain eighth-grade teammates in the gym locker room before and after basketball practice, and they sued the WBOE, along with the Director of Schools Wanda Johnston, WMS Principal Ryan Keaton, and Coach David Sisk, alleging violations of Section 1983 and Title IX and asserting a claim for negligence. (Docket Nos. 1 and 13.) In October 2010, following considerable discovery, the plaintiffs amended their Complaint to remove the negligence claim and to add allegations to support their Title IX and Section 1983 claims. (Docket No. 46.)

On March 1, 2011, the court issued its ruling on the defendants' summary judgment motion. (See Docket No. 90.) The court dismissed all claims and defendants aside from the Title IX claim against WBOE. (*See id.*) In order to sustain the Title IX sexual harassment claim, the court found that the plaintiffs had to sufficiently show that: (1) the sexual harassment was "severe, pervasive, and objectively offensive," such that it "deprive[d] the plaintiff[s] of access to the educational opportunities or benefits provided by the school"; (2) the school had "actual knowledge of the sexual harassment"; and (3) the school was "deliberately indifferent to the harassment." (*Id*. at 11 quoting *Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 258-59 (6th Cir. 2000)).

In allowing the Title IX claim to proceed to trial, the court found that there was sufficient evidence to support the plaintiffs' position on all three elements of the claim. As to the severity of the harassment, the court focused on the "pranks" that certain eighth graders pulled on John and James Doe, which, as discussed below, included an ongoing phenomenon called "lights out!" and each child being subjected to one "particularly offensive single incident," that

2

is, the "marker incident" impacting John Doe and the "blind-folded sit-up" impacting James Doe. (*Id*. at 14.) The court found the harassment sufficiently severe, and, given that the plaintiffs pulled their sons out of WMS shortly after these incidents, the court found that "there is a direct causal linkage between the harassment (and the school's response thereto) and the decision by the plaintiffs to pull their sons out of WMS, depriving them of considerable educational opportunities, including a continuous school year in the same environment and the opportunity to continue on the basketball team. The first prong of the test is easily met." (*Id*.)

As to the later two prongs of the test, consistent with the arguments raised in summary judgment briefing (*see* Docket No. 73 at 12-16), the court focused on Coach Sisk's knowledge of the chaotic and "horseplay" laden atmosphere inside the locker room prior to the more serious events in this case and the fact that Sisk may have given the eighth graders the idea for the "blind-folded sit-up." (Docket No. 90 at 14-15.) Specifically, the court stated:

> a reasonable jury could [] conclude that, based on all of the testimony and circumstances, someone in Sisk's position would know "enough" about sexual harassment of younger players on the team to step in and attempt to effectively address the problem.
>
> The same jury could also find that Sisk was deliberately indifferent for all of the reasons expressed by the plaintiffs. That is, the jury could conclude that for Sisk to offer no substantive response to the bubbling problem of sexual harassment on the team was unreasonable. This finding would be aided by the fact that Sisk arguably, if inadvertently, encouraged this misconduct by giving his players the idea of the blindfolded sit-up and by the fact that Sisk appears to have consistently "looked the other way" rather than facing the problem . . . .
> (*Id*.)

The trial of this matter was conducted in Columbia, Tennessee from June 7-9, 2011. As WBOE points out in its briefing here, in contrast to the summary judgment record, there was

3

very little evidence presented at trial that Sisk knew of any inappropriate conduct in the locker room until after the primary harassing events had occurred.[1]  Indeed, Sisk's unconverted testimony revealed that, because he was not a regular presence in the locker room before and after practice, he was oblivious to the abuse endured by the seventh graders on his team, learning of it only through the school's subsequent investigation of the "marker incident."

In building their case for "actual notice" and "deliberate indifference" on the part of the WBOE then, the plaintiffs focused on the response of school officials after the allegations of abuse and harassment had come to light.  From the testimony offered at trial, this basic time line of the relevant events emerged:

> – From the start of the 2008 Fall Semester onward – certain eighth graders subjected John and James Doe, among others, to repeated incidents of "lights out!," in which the eighth graders would: ensure that the locker room door was closed, turn off all the lights in the locker room and then begin humping and gyrating on the seventh graders. The "ring leaders" of "lights out!" were also the boys primarily involved in the "blind-folded sit-up" and the "marker incident," discussed below.

> – In the early Fall 2008 – James Doe was convinced by these eighth graders to do the "blind-folded sit-up" in the locker room, and when James Doe came to the end of the sit-up, one of the eighth graders had placed his naked rear end so that James Doe hit the rear end with his (blind-folded) face.

> – October 22nd or October 24th, 2008 – The "marker incident."  John Doe testified that, after practice, he was grabbed by four of these eighth graders, held down, his shorts were pulled down and a marker was shoved up his rectum.  John Doe's version of the "marker incident" and the severity of the personal violation that occurred was a heavily disputed issue at trial.

> – Sunday, October 26, 2008 – Sisk was alerted to the "marker incident" by his step-daughter, who had heard rumors of the incident from her peers at WMS.

---

[1] In discussing the testimony at trial, the court is primarily relying on the parties' briefs, along with its notes and recollections from the trial.

Sisk spent the next few days trying to determine the accuracy of the report that he had received from his step-daughter, but he did not report the allegation to Principal Keaton or anyone else.

– Thursday, October 30, 2008 – after learning of the "marker incident" from her son the night before, John Doe's mother, plaintiff Shanwee Mathis, met with Keaton in his office to report the incident. Mathis testified that Keaton took her report and informed her that he could not take any formal disciplinary steps until Director of Schools Johnston returned from out of town.[2] However, as Keaton testified, he ordered basketball practice canceled for October 30th and October 31st, and he began taking written statements from the alleged perpetrators and consulting with Johnston by phone on October 30th.

– Friday, October 31, 2008 – Johnston returned from out of town and met with Mathis, Keaton, and other senior school officials regarding the "marker incident." Johnston and Keaton, after collecting written statements, decided that there was sufficient evidence supporting John Doe's allegation to justify suspending the four boys involved in the "marker incident" for 10 days. The suspension was set to begin (and did begin) the following Monday, November 3rd, and was served in the "Alternative School." The boys were also suspended from the basketball team. The suspension would be reviewed at the next discipline hearing authority (DHA) meeting.

– Tuesday, November 4, 2008 – after learning from her son James Doe of the "blind-folded sit-up" and "lights out!" the evening before, plaintiff Tammy McGuire, along with another parent, visited Keaton to discuss their concerns about misconduct in the locker room. Keaton testified that the parties to the meeting specifically discussed "lights out!" and the "blind-folded sit-up" to which James Doe was subjected. McGuire testified that Keaton made no indication that he would investigate or punish this conduct and that she was surprised by his apparent lack of concern. Keaton testified that he did not believe that the "blind-folded sit-up" was "sexual" in nature and it amounted to a "bad prank." Keaton also testified that he did punish this conduct, through "verbal reprimand" a few months later.

– November 4, 2008 through November 7, 2008 (approximately) – McGuire and John and James Doe all testified that, during this period, John and James Doe continued to be "harassed" by their peers. While McGuire and James Doe only testified to general "harassment," John Doe testified that he was repeatedly called

---

[2]Johnston and Keaton both testified that Keaton did have authority to suspend students on his own.

5

"gay" by other students who learned that he had been violated with the marker.

– Thursday November 6, 2008 – McGuire, another parent, and John Doe's stepfather met with Johnston and Wayne County Schools "Complaint Manager" Gailand Grinder to discuss the "blind-folded sit-up," the "marker incident," and "lights out!" McGuire testified that the attitude of school officials during the meeting was "very calloused," again with no indication that the officials were prepared to promptly take additional action against the alleged perpetrators or Coach Sisk. McGuire testified that she left this meeting and her conversations with Keaton with the distinct impression that the school was only prepared to investigate the "marker incident," not these other complaints. Mathis also testified that her husband returned from this meeting "very frustrated" by the lack of action from school officials.

– November 6, 2008 (ongoing) – According to Keaton's testimony, WMS officials *begin* taking a series of actions designed to combat this sort of misconduct in the locker room. That is, in addition to Sisk being more watchful, sixth graders were required to dress in a different room from seventh and eighth graders, seventh and eighth graders were to dress at different times, boys were now to dress with the locker room doors open, an extra coach was brought in to monitor the boys, further teaching on bullying was mandated, and counseling from an outside source was offered to the members of the team. Keaton testified that no further incidents were reported to him following these changes.

– November 7, 2008 – McGuire removed James Doe from WMS, concerned that, as she testified, her son would not be safe given the perceived lack of action of school officials to address the harassment. Additionally, on this day, Johnston issued a written reprimand to Sisk for failing to report the "marker incident."

– November 17, 2008 – There was a meeting of the DHA, with Johnston and Keaton present. The primary focus of that meeting was the "marker incident." Indeed, Johnston testified that, despite knowing about "lights out!" and the "blind-folded sit-up," she did not raise these issues with the DHA and generally told the DHA that the alleged perpetrators were "good kids." Keaton testified that he raised these other incidents with the DHA at the meeting, although there is no record of this in the minutes. The DHA voted four votes to two to add one day to the suspension of the four alleged perpetrators of the "marker incident" and to reinstate them to the basketball team effective January 1, 2009. In so doing, the DHA rejected a motion to suspend the alleged perpetrators for the remainder of the season. The alleged perpetrators of the "marker incident" appealed their suspension to the WBOE.

– December 18, 2008 – The WBOE ruled on the appeal, reinstating the alleged perpetrators to the basketball team effective December 1, 2008. Mathis testified that, following the DHA ruling but before the WBOE ruling on the appeal, she repeatedly corresponded with senior school officials in an effort to ensure that the alleged perpetrators were not allowed to return to the basketball team. Following the WBOE appeal ruling, Mathis removed John Doe from WMS.

Running throughout the plaintiffs' case was the theme that the WBOE did not issue further discipline beyond the short-term suspension for the "marker incident" because the alleged perpetrators had close familial connections to school officials. Indeed, Keaton testified that three of the four boys allegedly involved in the "marker incident" had a parent employed by WMS, another Waynesboro school or the School Board. After hearing three days of testimony and argument, the jury returned with a verdict in favor of the plaintiffs on the Title IX claim, awarding each plaintiff $100,000 in damages. (Docket No. 141.)

## ANALYSIS

The WBOE has moved, pursuant to Fed. R. Civ. P. 50(b), for a judgment not withstanding the verdict (JNOV) or, pursuant to Fed. R. Civ. P. 59, for a new trial in this matter, arguing that the evidence adduced at trial does not support a Title IX claim. (Docket No. 144). Following their victory at trial, the plaintiffs have moved for attorney's fees pursuant to 42 U.S.C. § 1988 and for post-judgment interest pursuant to 28 U.S.C. § 1961. (Docket Nos. 147 and 148.)

**I.     Post-Trial Relief**

    **A.     Standard of Review**

        **i..     Rule 50(b)**

A motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure

50(b) may only be granted where, in viewing the evidence in the light most favorable to the non-moving party, no genuine issue of material fact remains for the jury, and all reasonable minds would necessarily find in favor of the moving party. *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001). That is, here, viewing the evidence in the light most favorable to the plaintiffs, the WBOE must show that the evidence in favor of its position was so overwhelming that no reasonable factfinder could find in the plaintiffs' favor. *Patton v. Sears, Roebuck & Co.*, 234 F.3d 1269, 1269 (6th Cir. 2000).

### ii. Rule 59(a)

While a new trial can be ordered for a wide variety of reasons, generally, a court may grant a new trial under Fed. R. Civ. P. 59(a) "if the verdict is against the weight of the evidence, if the damages award is excessive, or if the trial was influenced by prejudice or bias, or otherwise unfair to the moving party." *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 637 (6th Cir. 2000). The burden of demonstrating the necessity of a new trial is on the moving party, and the ultimate decision whether to grant such relief is a matter vested within the sound discretion of the district court. *Clarksville-Montgomery Co. Sch. Sys. v. U.S. Gypsum Co.*, 925 F.2d 993, 1002 (6th Cir. 1991).

Here, based on the WBOE's briefing, the only relevant consideration is whether the verdict was against the weight of the evidence. In making this determination, a trial court may compare and weigh the opposing evidence. *Conte*, 215 F.3d at 637. It may not, however, set aside a jury's verdict simply because the court might have reached a different conclusion or might have drawn different inferences; the jury's verdict should be accepted if it "could

8

reasonably have been reached." *Id.*

## B. The WBOE's Motion

The WBOE's motion does not challenge the jury's findings on certain elements of the Title IX claim. That is, the WBOE does not argue that the harassment claimed by the plaintiffs was not "severe, pervasive, and objectively offensive," such that it "deprive[d] the plaintiff[s] of access to the educational opportunities or benefits provided by the school." (*See* Docket No. 146.) Additionally, while the WBOE stresses the fact that the plaintiffs did not offer significant evidence that Sisk knew of "sexual discrimination prior to the marker and sit up incident involving the minor plaintiffs," WBOE does not challenge that, as of October 26, 2008 (when Sisk's step-daughter alerted him to the "marker incident"), the WBOE had "actual notice" of the "marker incident" or that, by November 4, 2008, the WBOE had actual notice of "lights out!" and the "blind-folded sit-up." (*Id.*)

Therefore, for Title IX purposes, the crux of the issue is whether the plaintiffs produced sufficient evidence of deliberate indifference following actual notice. The WBOE argues that the plaintiffs presented no evidence at trial that any sexual discrimination occurred after the defendants had actual notice of harassment. (*Id.*) Rather, the defendant maintains, the evidence shows that WBOE officials learned of the alleged misconduct, responded to it through a series of measures that included promptly punishing the students involved and making systemic changes, and any harassment stopped. (*Id.*) Given that the response was sufficient to stop the harassment, the WBOE maintains, it cannot be reasonably concluded that the WBOE's response to the harassment was "deliberately indifferent," as required to sustain a Title IX claim. (*Id.* at 3 citing

9

*Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999), which concluded that a "prompt and thorough response" to harassment by school officials was not "clearly unreasonable" under the circumstances and, therefore, the plaintiff's deliberate indifference argument failed).

As indicated by the instructions that the jury received, which defined a "deliberate indifferent" response as one that was "clearly unreasonable in light of the known circumstances" (Docket No. 137 at 17), the issue of whether the WBOE was deliberately indifferent is a fact-specific inquiry, the outcome of which depends greatly on the jury's evaluation of witness credibility and its independent determination of the course of events. *See Hart v. Paint Valley Local Sch. Dist.*, 2002 WL 31951264, *9 (S.D. Ohio Nov. 15, 2002)(finding that deliberate indifference is generally a jury issue that "does not lend itself well" to a legal determination by the court). In light of this, the court must afford the jury's conclusion on this issue considerable deference.

To be sure, the "deliberate indifference" standard sets a fairly high bar for the plaintiffs to meet. Again, the response must be "clearly unreasonable" under the circumstances, and, the Sixth Circuit has concluded, the "deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Patterson v. Hudson Area Schs.*, 551 F.3d. 438, 446 (6th Cir. 2009)(internal citation and quotation omitted). Moreover, as indicated in the instructions, the school is entitled to considerable leeway in terms of how it combats student-on-student sexual harassment, and a plaintiff is not entitled to a "particular disciplinary action," only an action that is not clearly unreasonable. *Id.; see also* Docket No. 137 at 17.

The court concludes that the jury's finding of "deliberate indifference" here "could reasonably have been reached" and, therefore, post-trial relief for the WBOE would not be appropriate. First, as to James Doe, it is clear from the testimony at trial that the WBOE conducted no substantive investigation of the "blind-folded sit-up" or the "lights out!" and did not consider or levy any punishment for those specific actions. Indeed, the jury was presented with considerable testimony that Keaton and Johnston ignored or consciously discounted the degree of sexual harassment that James Doe was enduring in the locker room, choosing only to focus on the "marker incident."

The jury heard testimony that school officials, in two meetings during the week of November 3, 2008, left plaintiff McGuire with the distinct impression that they were not going to take any substantive action to protect her son from future harassment and that they were only addressing the "marker incident." Further, McGuire was given no indication that Coach Sisk – who made no effort to control the locker room and had failed to report the "marker incident" – would be disciplined in any substantive way. Indeed, Coach Sisk, in the end, only received a written reprimand and was allowed to continue coaching the team. In light of this, plaintiff McGuire felt that she had no choice but to remove her son from school, as there was no indication that anything was going to be done to address her son's specific problems.

It is true that school officials, primarily responding to the "marker incident," took steps to increase the safety and security of the students in the locker room. But given that these steps were implemented over time (beginning at the earliest on November 6, 2008), the jury likely recognized that these steps came too late to aid James Doe, as he was pulled out of WMS on

11

November 7, 2008. A jury could readily find that the defendant's response (no investigation, no punishment, and "calloused" reaction to McGuire's concerns) to the known harassment of James Doe was "clearly unreasonable" and drove James Doe out of WMS before he could receive the ancillary benefit of any remedial measures. Therefore, the defendant's motion for post-trial relief as to James Doe is not viable.

Second, as to John Doe, he testified at trial that, after the alleged perpetrators were suspended, he was still harassed in the halls of the school, as students would refer to him as "gay" in light of the "marker incident." It is worth noting that the Sixth Circuit has concluded that this type of sexually charged verbal harassment is actionable under Title IX. *See Patterson*, 551 F.3d at 446. Moreover, this testimony contradicts the WBOE's core argument for post-trial relief, which is that its remedies were effective at ending the harassment endured by the students and, therefore, not clearly unreasonable.

Further, the jury could have reasonably concluded that the WBOE's substantive response to the "marker incident" was "clearly unreasonable." Again, this is a fact-specific inquiry in which the jury was charged with making the relevant credibility determinations. The jury, if it chose to believe the testimony of John Doe and others, could have concluded that the "marker incident" was not horseplay gone awry (as the perpetrators testified) but a serious and troubling incident of sexual assault, akin to forcible sodomy. Viewing the incident from this perspective and considering that John Doe had also been subject to "lights out!" and other harassment, the jury could certainly have concluded that the only reasonable solution was a severe punishment.

Instead, the boys involved were suspended for 11 days, and, in the end, only formally

suspended from the basketball team for about a month. The jury was left to contrast this punishment with, for instance, Johnston's testimony that established that WBOE policy dictates that an assault on a school official by a student is punishable by a suspension for the entire school year. Moreover, even though the school made some changes to increase the safety and security of the locker room, the jury could have reasonably concluded that any decision that returned the alleged perpetrators to the basketball team was clearly unreasonable, given that John Doe would be subjected to interacting with these boys in close quarters on a daily basis and that basketball is a voluntary extra-curricular activity that is not essential to an education. In searching for answers for why the boys were returned to the team so quickly, the jury could have certainly considered the testimony that the four boys were among the better players on the team and had parents employed by the defendant.

In light of all this, while the defendant did offer considerable evidence of a response to the "marker incident," the jury could still conclude that the response (1) did not end the sexually charged harassment faced by John Doe, (2) clearly left him vulnerable to further harassment for the sake of improving the basketball team, and (3) was guided by less than pure motivations. Therefore, the jury's conclusion that the WBOE acted with deliberate indifference here could reasonably have been reached.

The WBOE's motion for post-trial relief, therefore, will be denied.

## II.     Attorney's Fees and Interest[3]

---

[3]The plaintiffs have moved for post-judgment interest on the principal amount of their award "from the time judgment is entered until it is paid." (Docket No. 147.) The defendant did not file a response to this motion, and post-judgment interest is authorized in this case, pursuant

There is no dispute that the plaintiffs' victory at trial entitles them to reasonable attorney's fees under 42 U.S.C. § 1988. (Docket No. 151 at 1.). There is also no dispute that the starting point for setting the fee award is the "lodestar method." (Docket No. 143 at 3; Docket No. 151 at 2.)

Under this method, the requested fee is compared with the amount generated by multiplying the number of hours reasonably worked on the litigation by the reasonable hourly rate; a reasonable hourly rate is determined by considering the skill, experience, and reputation of the attorneys involved and the market in which they practice. *Adlock-Ladd v. Secretary of Treasury*, 227 F.3d 343, 350 (6th Cir. 2000). If the requested fee is essentially in line with the "lodestar," then there is a strong presumption that the requested fee is reasonable and recoverable.[4] *Id.*

---

to 28 U.S.C. § 1961. Therefore, the court will grant this motion, with the final amount of interest to be determined based on the date that the judgment is paid and the relevant rate of interest. Additionally, the parties apparently have resolved their dispute over the costs to be awarded in this case. (Docket No. 151 at 5.) Consistent with this, the court will award the plaintiffs $1909.87 in costs, on top of the attorney's fee award. (*Id.*)

[4]It is possible, however, that the *Johnson* factors might justify a departure (upward or downward from the "lodestar"). *See Reed v. Rhodes*, 179 F.3d 453, 471 (6th Cir. 1999)(*citing Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)). These factors are: (1) the time and labor required by a given case; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.* The Sixth Circuit has recognized that, often, these factors are naturally blended into the reasonableness analysis. *Paschal v. Flagstar Bank*, 297 F.3d 431, 435 (6th Cir. 2002).

The plaintiffs maintain that both the hours spent by their attorneys on this litigation and their stated hourly rates are reasonable. Consistent with standard practice, plaintiffs' counsel (Edmund Schmidt and Ann Johnson) have submitted time records that document the date that they worked on an issue in this case, how long they spent, and what they did. (Docket No. 149 Exs. 1-2.) These records reveal that plaintiffs' counsel spent a combined 651.25 hours on this case, with Schmidt logging 427 hours and Johnson logging 224.5 hours. (*Id*.) In briefing, Schmidt maintains that "the vast bulk of each task was performed by only one lawyer, thus eliminating most duplication." (Docket No. 149 at 4.)

In asserting that their hourly rates ($400 per hour for Schmidt and $225 for Johnson) are reasonable and consistent with the market rate and skill level involved, the plaintiffs provide declarations from Schmidt and Johnson, along with declarations from Nashville, Tennessee based attorneys George Barrett and William Ramsey. (See Docket No. 149 Exs. 1-4.) Schmidt's declaration recounts that he is a trial lawyer with 27 years of experience in private practice and that he has successfully represented plaintiffs in civil rights cases in this court and others, including recovering a fee award based upon $350 per hour for a case filed in Louisiana in 2004 and for a case filed in this District in 2006. (Docket No. 149 Ex. 1.)

Johnson's declaration states that she has ten years of experience as an attorney, roughly five years experience in private practice including significant trial experience, and that her hourly rate is $225 per hour. (Docket No. 149 Ex. 2.) The Barrett and Ramsey declarations state that the fees sought in this case are reasonable based upon the market, the complexity of this case, and the skill of the attorneys involved. (Docket No. 149 Exs. 3-4.) The plaintiffs also

15

provide a series of cases recognizing hourly rates as high as $400 per hour as reasonable in the Nashville, Tennessee market. *See e.g. Qualls v. Camp*, 2007 WL 2198334 (Tenn Ct. App. July 23, 2007). All tolled, the plaintiffs seek $221,256.25 in attorney's fees.[5] (Docket No. 149 at 6.)

The WBOE states that it has "partial" opposition to the fee request, only challenging the hourly fee sought by Schmidt, several individual time entries, and seeking a reduction from the lodestar for limited success. (Docket No. 151 at 1.)

### i. Schmidt's rate

In terms of Schmidt's rate, the WBOE notes that, in the 2006 case filed in this District that Schmidt references in his declaration, Schmidt also requested $400 per hour but Judge Echols, in his September 2008 decision, "found the appropriate rate to be $350.00 per hour." (*Id*. at 3.) Given this, and the lack of evidence "to warrant an increase of nearly 15 percent in Mr. Schmidt's hourly rate over the last three years," the WBOE suggests that the $350 per hour rate remains appropriate. (*Id*.) Given the affidavits presented and the three years that have passed since Judge Echols's determination that $350 per hour was an appropriate fee, the court finds that $375 per hour is a reasonable hourly rate to compensate Schmidt for his work in this case. Again, this was a challenging case, with very sensitive facts; it is only reasonable under these circumstances to award Schmidt an hourly rate that is consistent with that charged by partners in Nashville, Tennessee. The court makes this slight reduction to the requested fee in consideration of the downturn in the legal market and the court's own knowledge of fees being

---

[5]For Schmidt, 427 hours at $400 per hour is $170,800 and, for Johnson, 224.25 hours at $225 per hour is $50,456.25.

16

charged in the Nashville legal community.

### ii. Individual time entries

On the individual time entries, the WBOE filed a spreadsheet with "specific time entry objections," pointing out time entries for Schmidt and Johnson that it believes are "duplicative, unnecessary or in the case of experts who were excluded, unallowable." (*Id*. at 3.) As to Schmidt, the WBOE objects to specific entries either because they (1) "appear duplicative" of other entries or of work done by Johnson, (2) involve work for experts who were later excluded from testifying at trial, (3) relate to preparing a Motion to Compel that was never filed, or (4) relate to summary judgment briefing. (Docket No. 151 Ex. 1.) On this last point, the WBOE maintains that the 68 hours that plaintiffs' counsel purports to have spent on summary judgment briefing was excessive, given that defense counsel spent only 36.8 hours on the "motion and related filings exclusive of the reply filings." (*Id*.) The WBOE suggests a 28-hour reduction for summary judgment briefing, and its assorted other challenges to Schmidt's entries seek a combined time reduction of 28.25 hours.

As to Johnson, the WBOE claims that 49 hours of Johnson's time during depositions and deposition preparation was duplicative of Schmidt's time, and the WBOE objects to Johnson billing for the 1.75 hours it took to obtain a letter of good standing to practice in this court. (Docket No. 151 Ex. 2.) On this latter point, the WBOE claims that it "should not bear the cost of counsel satisfying the requirements to be admitted to this court." (*Id.*) The court agrees; it was the plaintiffs' choice to retain counsel from out-of-state, and the plaintiffs should have to bear this relatively minor cost.

Moving on, the court does not find 68 hours of work on summary judgment briefing in a complex and factually rich case to be excessive. A party is generally afforded 21 days to respond to a summary judgment motion, and this is commonly a busy time for counsel. Here, counsel on average spent slightly more than 3 hours per day during this window on the response and associated exhibits, which is certainly not facially excessive.

Further, the defendant's statement that certain entries appear duplicative is purely conclusory and likely inaccurate; rather, it simply appears that either one attorney was doing the same general task on multiple days or both attorneys were working on the same general task, such as preparing for depositions. There is nothing to suggest that the allegedly duplicative entries represent an attorney doing work that did not advance the plaintiff's case. Finally, on the experts and the Motion to Compel, it is axiomatic that not every task that an attorney performs in a multi-year litigation will end up bearing fruit or directly advancing the case. The case law instructs, however, that as long as the total hours are reasonable and the rate is reasonable, the fee is recoverable. *See Isabel v. City of Memphis*, 404 F.3d 404, 416 (6th Cir. 2005). This complex and factually rich case proceeded for roughly two years with ample discovery, summary judgment briefing, a trial and post-trial briefing; yet, plaintiffs' counsel, combined, spent on average less an hour per day on the litigation. Clearly, the hours spent were not excessive.

### iii. Reduction for limited success

Finally, the defendant argues that the requested fee is "excessive," given "the level of success and the claims asserted." (Docket No. 151 at 1.) That is, the plaintiff initially asserted

claims for negligence and claims under Section 1983 and Title IX against the WBOE and three individual defendants and sought millions of dollars in damages. (*Id*. at 2.) Yet, in the end, the WBOE points out, the plaintiffs only recovered on one claim against one defendant and "only" for $100,000 each. (*Id*.) The defendant suggests that, in light of this, some "adjustment of the lodestar for limited success (20-25 percent)" is appropriate. (*Id*. at 4-5.)

As the WBOE concedes, a "court should not reduce attorney fees based on a simple ratio of successful claims to claims raised." *Deja Vu Nashville, Inc. v. Metro. Gov't. of Nashville & Davidson County*, 421 F.3d 417, 423 (6th Cir. 2005). Indeed, the Sixth Circuit has concluded that, "where a plaintiff has obtained excellent results, his attorney should recover a full compensatory fee." *Isabel*, 404 F.3d at 416. Further, a "proffer of alternative arguments does not justify reducing an award, especially where the arguments were made on a common set of facts and success on just one of the arguments would achieve the hoped for results." *Id*. Finally, reductions in the lodestar are only to be applied in "rare and exceptional cases where specific evidence in the record requires it." *Id*.

In light of this case law, the defendant's "limited success" argument is without merit. Clearly, the plaintiffs obtained "excellent results," as the jury concluded that the plaintiffs' civil rights had been violated by the manner in which the school system responded to the allegations of abuse and harassment in the locker room. Further, while the plaintiffs may have sought a more considerable damage award in the Complaint, the jury awarded the plaintiffs the precise amount that counsel requested in his opening statement The results here were excellent, and a full compensatory fee is appropriate. Consistent with the analysis and slight adjustments

19

discussed above, the court will award the plaintiffs $210,187.50.

## **CONCLUSION**

For the reasons discussed herein, the WBOE's motion for post-trial relief will be denied, and the plaintiffs' motions for attorney's fees and interest will be granted.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge